c

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **RIGHT TO VOTE ON THE GAS TAX PAC; VIRGINIA HALL, MICHAEL FIRESTONE, PAUL RUMMELL, and BEN ROCHE**, | Case No. 3:26-cv-515-SI |
| Plaintiffs, | **OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| **TOBIAS READ**, *in his official capacity as Secretary of State for the State of Oregon*, | |
| Defendant. | |

Thomas R. Rask, III and Julie Parrish, KELL ALTERMAN & RUNSTEIN LLP, 520 SW Yamhill Street, Suite 600, Portland, OR 97204. Of Attorneys for Plaintiffs.

Dan Rayfield, Oregon Attorney General; and Thomas H. Castelli and Austin D. Saylor, Senior Assistant Attorneys General, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

An Oregon Political Action Committee and five registered Oregon voters (collectively,

"Plaintiffs") have sued the Oregon Secretary of State in his official capacity. ECF 1.[1] Plaintiffs

---

[1] The caption of Plaintiffs' Complaint indicates that additional "John Does" and "Jane Does" also are plaintiffs here. The local rules of the District of Oregon do not allow for fictitiously named plaintiffs and leave of court to use fictitious names has been neither requested

have moved for a temporary restraining order ("TRO") to enjoin the Oregon Secretary of State from enforcing Oregon Revised Statute ("ORS") 251.255(2)(a) against them, so that their written arguments about Referendum Petition 2026-302 may appear in the statewide Voters' Pamphlet for the upcoming primary election scheduled for May 19, 2026. In their Complaint, Plaintiffs allege violations of their free speech rights under the First Amendment (actionable under 42 U.S.C. § 1983), violations of their rights to procedural due process under the Fourteenth Amendment (also actionable under 42 U.S.C. § 1983), and violations of their rights under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. ECF 1. In support of their motion for TRO, however, Plaintiffs assert only their claims alleging violations of their right to free speech and violations of the ADA. ECF 2.

## BACKGROUND[2]

### A.  The Upcoming Primary Election

On September 29, 2025, the Oregon Legislature passed House Bill ("HB") 3991, enacting a transportation funding package that raised the state gasoline tax from $0.40 to $0.46

---

nor granted. As explained by the Ninth Circuit, "[p]laintiffs' use of fictitious names runs afoul of the public's common law right of access to judicial proceedings . . . and Rule 10(a)'s command that the title of every complaint include the names of all the parties." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000) (citations and quotation marks omitted). The Ninth Circuit has also stated: "In this circuit, we allow parties to use pseudonyms in the 'unusual case' when nondisclosure of the party's identity 'is necessary . . . to protect a person from harassment, injury, ridicule or personal embarrassment.'" *Id.* at 1067-68. These circumstances are not present here. Instead, at the time when the Complaint was filed, Plaintiffs' counsel simply was unaware of the names of additional persons who might be similarly situated and may—or may not—want to participate as additional plaintiffs. *See* Compl. ¶ 28. Plaintiffs chose not to bring this case as a putative class action, chose not to move for provisional class certification, and chose not to move to amend their Complaint to add additional named parties. Because the Ninth Circuit and Rule 10 of the Federal Rules of Civil Procedure disfavor the use of factitious names, the Court disregards all references to John Doe and John Doe parties.

[2] For purposes of the pending motion only, the Court finds the following facts.

per gallon, effective January 1, 2026. The bill also nearly doubled vehicle registration and title fees and temporarily doubled the payroll tax for public transit. Oregon Governor Tina Kotek signed the bill into law on November 7, 2025.

Many citizens responded by launching Referendum Petition 2026-302, now known as "Measure 120." This campaign was led by State Representative Ed Diehl and others. Petitioners gathered more than 250,000 signatures, exceeding the number required under Oregon law for placement of a referendum on the ballot. Oregon Secretary of State Tobias Read verified and qualified the petition and placed it on the ballot for the general election scheduled for November 3, 2026. The State then paused the challenged tax increases, consistent with Oregon law.

During the 2026 "short" legislative session, the Oregon Legislative Assembly passed Senate Bill ("SB") 1599A to accelerate the referendum vote from the November 2026 general election to the May 2026 primary election. In a memorandum dated January 27, 2026, the Secretary of State's office advised that any such move must include an emergency clause and should be signed into law no later than February 25, 2026. The Secretary explained that this deadline was necessary to preserve at least ten business days for the public to submit arguments to be published in the state Voters' Pamphlet without paying the $1,200 filing fee.[3] When that

---

[3] Oregon law allows any person to file with the Secretary of State an argument supporting or opposing a state measure that will be voted upon at a general or primary election. ORS 251.255(1). Oregon law further provides: "A person filing an argument under this section shall pay a fee of $1,200 to the Secretary of State when the argument is filed or may submit a petition in a form prescribed by the Secretary of State containing the signatures of 500 active electors." ORS 251.255(2)(a). Properly qualifying arguments will be published and distributed in a statewide Voters' Pamphlet. *See* ORS 251.026. For the May 2026 election, the statewide Voters' Pamphlet must be mailed to voters not later than April 29, 2026. *See* ORS 251.175. To be included in the Voters' Pamphlet for the May 2026 primary election, written arguments, along with the required fee or petition signatures, must be submitted to—and verified by—the

PAGE 3 – OPINION AND ORDER

deadline passed, the Secretary of State sent an email to legislative leaders on February 25, 2026, warning that every additional day of delay would compress statutory timelines, make it more challenging for his office to provide the free alternative to the $1,200 fee, and limit Oregonians' ability to make informed decisions and have their voices heard.

Governor Kotek signed SB 1599A into law on March 2, 2026. Shortly thereafter, Secretary of State Read issued a temporary administrative rule, OAR 165-016-9901, setting March 12, 2026, at 5:00 p.m. as the firm deadline for the submission of all Voters' Pamphlet arguments for the election to be held on May 19, 2026. Under ORS 251.255(2)(b), anyone seeking to submit an argument for publication must either pay $1,200 or gather 500 original signatures verified by the Secretary of State by that date and time. The Secretary of State has no statutory authority to waive this requirement.

**B.  The Plaintiffs**

The Complaint alleges that Plaintiff Right to Vote on the Gas Tax PAC ("RTV") is a registered Oregon political action committee, organized by Edwin Diehl, Bruce Starr, and Jason Williams. Compl. ¶ 1. Edwin Diehl ("Diehl") is a registered voter in Oregon. Declaration of Edwin Diehl ¶ 3. ECF 1-10. Diehl joined with Bruce Starr and Jason Williams to put the tax-raising provisions of HB 3991 to a vote by direct legislation referendum. *Id.* ¶ 5. When SB 1599A became law, Diehl "timely filed a paid measure statement using a personal contribution of funds." *Id.* ¶ 13. RTV does not allege that it submitted a measure statement for publication.[4]

---

Secretary of State not later than March 12, 2026, at 5:00 p.m. *See* ECF 1 at 24-25; OAR 165-016-9901.

[4] Although RTV purports to represent the John and Jane Does fictitiously named in the Complaint under a theory of associational standing, RTV cannot do so, at least as currently alleged. "An organization has 'associational standing' to sue on behalf of its members if it can

Plaintiff Virginia Hall ("Hall") is a registered voter in Oregon. Decl. of Virginia Hall ¶ 3. ECF 1-11. Hall is "an elderly citizen who has a 25% service-connected-disability rating with the United States Department of Veterans Affairs in connection with [her] military service." *Id.* ¶ 8. She is "mobility limited" and "expected when Measure 120 first qualified for the ballot [she] would have the time necessary to exercise [her] right to have fee-free arguments in the voters' pamphlet for the November elections." *Id.* She "did not gather 500 signatures per petition because [she] was physically unable to do so." *Id.* ¶ 9. She adds that she "does not have $2,400" to submit the two arguments that she would have otherwise had time to gather if Measure 120 had not been moved to the May primary election. *Id.* ¶ 16.

Plaintiff Michael Firestone ("Firestone") is a registered voter in Oregon. Declaration of Michael Firestone ¶ 3. ECF 1-12. When Senate Bill 1599A became law, Firestone filed by March 12, 2026, arguments to be included in the free speech portion of the voters' pamphlet. *Id.* ¶ 7. Firestone "did not reasonably understand that [his] petition signatures needed to be validated

---

demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Nat'l Grocers v. Rollins*, 157 F.4th 1143, 1157 (9th Cir. 2025) (quoting *Hunt v. Wash. St. Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

RTV is comprised of three individual Oregon voters who are not represented as individuals in this litigation. Compl. ¶¶ 22-23. As noted, RTV purports to bring this action on behalf of the John and Jane Does who untimely filed argument submissions and were denied publication. *Id.* ¶ 28. RTV, however, has no organizational standing because the claims asserted—First Amendment and ADA claims—require the participation in this lawsuit of the individual members. As explained in *Martin v. Read*, serious questions going to the merits of a plaintiff's claim might be found "based upon a confluence of highly unusual facts" that made the "alternative path" to placing a statement in the Voters' Pamphlet, "as a practical matter, unavailable." No. 3:26-cv-433-SI, 2026 WL 686759, at *3 (D. Or. Mar. 11, 2026). Facts about an individual voter's disability and indigency, therefore, are "essential to a proper understanding and resolution" of that voter's claim, which precludes associational standing. *See Harris v. McRae*, 448 U.S. 297, 321 (1980) (holding that an organization lacks associational standing for its members' claims of violation of their right to the free exercise of their religion).

by 5:00 p.m. on March 12, 2026, until after [he] filed [his] petitions for a petition template because [he contends] there are no clear instructions on the Secretary of State's website that describe the process." *Id.* ¶ 10. He adds that he does "not have $1,200 to submit the argument [he] would have otherwise had time [to] gather[ ] signatures [for] this summer if Measure 120 hadn't been moved to the May primary election." *Id.* ¶ 13.

Plaintiff Paul Rummell ("Rummell") is a registered voter in Oregon. Declaration of Paul Rummell ¶ 3. ECF 1-13. "When Senate Bill 1599A became law, [Rummell] filed before 5:00 p.m. on March 12, 2026, a petition in opposition to Measure 120. [He] was aware of the urgent need to do so because [his] spouse had filed a paid statement in his capacity as a local elected official." *Id.* ¶ 7. Rummell "did not gather 500 signatures per petition because [he] did not know until after [his] petition was approved with less than two hours before the deadline that the deadline wasn't just to get a petition, but that petition signatures needed to be validated by the deadline." *Id.* ¶ 8. Rummell contends that "[n]owhere was that barrier made clear on the Secretary of State's website." *Id.*

Plaintiff Ben Roche ("Roche") is a registered voter in Oregon. Declaration of Ben Roche ¶ 3. ECF 1-14. "When Senate Bill 1599A became law, [Roche] timely filed an argument measure petition to circulate in opposition so that it might be included in the free speech portion of the voters' pamphlet. [He] did so on the very first business day after Senate Bill 1599A went into effect." *Id.* ¶ 7. "Although the Elections Division accepted [his] petitions and returned [his] SEL form to [him], [he] was told [his] statement would not be published without a fee. [He] asked for this fee to be waived and was denied." *Id.* ¶ 11. Roche states that he does not have $1,200 to submit his measure argument. *Id.* ¶ 12. According to documents filed with the Complaint, Roche gathered 92 signatures with his petition, which, he states, "represent approximately 18.4% of the

PAGE 6 – OPINION AND ORDER

required 500 signatures." ECF 1-8 at 2. He also represents that he "asked whether the 92 signatures would still be accepted and processed, even though they did not meet the 500-signature threshold required to qualify for the Voters' Pamphlet." ECF 1-8 at 1. He was "told yes, and the sheets were accepted." *Id.*

**STANDARDS**

In deciding whether to grant a motion for a TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1122-23 (9th Cir. 2024) (brackets omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021); *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"The first factor—likelihood of success on the merits—is 'the most important.'" *Apache Stronghold v. United States*, 101 F.4th 1036, 1049 (9th Cir. 2024) (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc)). The preliminary injunction factors are evaluated on a "sliding scale," however, such that "a stronger showing of one element may offset a weaker showing of another." *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). "Alternatively, a preliminary injunction may issue where 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the plaintiff 'also shows that there is a likelihood of irreparable injury and

PAGE 7 – OPINION AND ORDER

that the injunction is in the public interest.'" *Id.* (quoting *All. for the Wild Rockies*, 632 F.3d at 1135).

## DISCUSSION

### A. Free Speech

In *Kaplan v. County of Los Angeles*, 894 F.2d 1076 (9th Cir. 1990), the Ninth Circuit considered a challenge brought by Judge Leon Kaplan of the Los Angeles Superior Court to a California law that allows a county to charge fees to candidates for political office for costs associated with the publication of election statements in the county voters' pamphlet. The statute also provided that, "if a determination is made that the candidate is indigent, he or she is not required to pay the costs in advance." *Id.* at 1078. The Court held that a voters' pamphlet was a limited public forum, was content neutral, and satisfied the applicable lesser level of scrutiny because it served a significant state interest in a narrowly tailored fashion and left open ample alternative channels of communication. *Id.* at 1080. Against a facial challenge to the law, the Ninth Circuit held that the cost recovery system did not violate the First Amendment, explaining:

> The statute is narrowly drawn in that the local agencies can recover actual costs alone, and cannot profit from the publication charges nor finance election costs with them. *The statute exempts the indigent from cost liability* and leaves open a variety of alternative means for a candidate to transmit his statement to voters. *In light of these factors, we deem the cost recovery system constitutional under the First Amendment.*

*Id.* at 1081 (emphases added). The court also rejected the plaintiff's argument that "the cost recovery system runs afoul of the Fourteenth Amendment's equal protection clause." *Id.* The Court said that "[n]o candidate is excluded from being listed on the ballot by virtue of the cost recovery system." *Id.* at 1082. The Ninth Circuit followed *Kaplan* and arrived at the same result in *NAACP, Los Angeles Branch v. Jones*, 131 F.3d 1317 (9th Cir. 1997).

PAGE 8 – OPINION AND ORDER

Thus, there is no basis for a facial challenge to ORS 251.255(2)(a) under the Free Speech Clause of the First Amendment. But neither *Kaplan* nor *NAACP* considered an "as applied" challenge to a statutory scheme involving voters' pamphlets that provides an alternative path for indigent persons when, based on a confluence of highly unusual facts, that alternative path is, as a practical matter, unavailable. The Court has located no case law addressing this situation, and the parties have cited none. Accordingly, in *Martin v. Read*, No. 3:26-cv-433-SI, 2026 WL 686759 (D. Or. Mar. 11, 2026), the undersigned district judge found serious questions going to the merits and a balance of hardships that tipped sharply toward the plaintiff.

The case now before the Court is distinguishable from *Martin*. At oral argument, Plaintiffs' counsel conceded that none of the named individual Plaintiffs are indigent. Although Messrs. Firestone, Rummell, and Roche all stated that they did "not have $1,200," which was the filing fee needed to submit a single statement, and Ms. Hall stated that she did "not have $2,400," which was the filing fee needed to submit two separate statements, these statements do not show indigency, which was shown in *Martin* and which was referred to in *Kaplan*.

Plaintiffs respond that Oregon law does not require a showing of indigency to be eligible for the "free alternative" of providing a petition with 500 verified signatures. Plaintiffs are correct in their articulation of Oregon law. Plaintiffs then argue that based on the compressed timeline allowed for gathering and verifying signatures for the upcoming Voters' Pamphlet, it was nearly impossible for them to gather enough verified signatures to have their statements appear in the statewide Voters' Pamphlet, thereby depriving them of their First Amendment speech rights. The Court rejects this argument on two independent and alternative grounds.

First, although the compressed timeframe increased the difficulty of gathering 500 verified signatures, it was not impossible, even from a rural area. As shown in the Declaration of

PAGE 9 – OPINION AND ORDER

Joyce Furlong, ECF 1-15, Ms. Furlong is a 71-year-old resident of Klamath County. Through effort on her part and with the assistance of others, she timely gathered the necessary 500 verified signatures. *See id*; *see also* ECF 14-1 at 1. Her statement will appear in the Voters' Pamphlet. Thus, notwithstanding the compressed timeframe, gathering the necessary number of verified signatures can be done, even from a rural community. Second, even for someone who realistically could not gather the needed signatures in the allowable timeframe, absent a showing of indigency, there is no case law that would permit a finding of an "as applied" First Amendment violation. Plaintiff has presented no case law showing that a person, or at least a person who is not indigent, has a *constitutional right under the First Amendment* to have the state bear the expense of publishing and distributing that person's views. Thus, Plaintiffs have not shown a likelihood of success on, or even serious questions going to the merits of, their claim based on the Free Speech Clause of the First Amendment.

## B. Equal Protection

In their motion for TRO, Plaintiffs assert an Equal Protection argument, contending that "the $1,200 fee requirement with no reasonable alternative imposes an unconstitutional wealth barrier to participation." ECF 2 at 9. The Court rejects this argument for three independent and alternative reasons. First, Plaintiffs did not allege an Equal Protection claim in their Complaint. As noted, they asserted claims alleging only violations of their free speech rights under the First Amendment, their procedural due process rights under the Fourteenth Amendment, and their rights under the ADA. ECF 1. Second, the premise of their argument that there was "no reasonable alternative" to paying the $1,200 fee is belied by the success of 71-year-old Ms. Furlong from Klamath County. *See* ECF 1-15. If Ms. Furlong could do it, so could others. Third, Plaintiffs have presented no case law showing that, at least in the absence of indigency, there is even a colorable claim, or serious questions going to the merits, of an Equal Protection

PAGE 10 – OPINION AND ORDER

violation. Thus, Plaintiffs have not shown a likelihood of success on, or even serious questions going to the merits of, their claim based on the Equal Protection Clause of the Fourteenth Amendment.

## C.  Procedural Due Process

In their Complaint, Plaintiffs allege as their second claim a violation of their rights to procedural due process under the Fourteenth Amendment. The Court rejects this argument for two independent and alternative reasons. First, Plaintiffs make no mention of this claim in their motion for TRO. *See* ECF 2. Thus, although that claim remains, it cannot be a basis for granting the requested temporary injunctive relief. Second, Plaintiffs have presented no case law showing there is even a colorable claim, or serious questions going to the merits, of a Procedural Due Process claim.

Plaintiffs argue that their rejected submissions are the product of Defendant's failure to inform Plaintiffs about the deadlines imposed by OAR 165-016-9901 and that this failure constitutes a violation of their rights to procedural due process. Plaintiffs cite to *Armstrong v. Manzo*, 380 U.S. 545 (1965), and *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982). In *Armstrong*, a father received no notice that his child was being put up for adoption until after the adoption had been completed. 380 U.S. at 548-49. In *Logan*, an aggrieved employer received no administrative hearing despite having a statutory right entitling him to one, because the state commission in charge of adjudicating his claim scheduled the hearing after the statutory deadline had passed. 455 U.S. at 426-27. In both cases, the State destroyed an established liberty or property interest "without first giving the putative owner an opportunity to present his claim for entitlement." *Id.* at 434. Thus, both *Armstrong* and *Logan* are distinguishable.

Even if ORS 251.255(2)(a) creates a protectable "liberty" or "property" interest in placing one's statement in a state-sponsored Voters' Pamphlet (a proposition about which the

PAGE 11 – OPINION AND ORDER

Court is skeptical), OAR 165-016-9901 was publicly available and accessible well before the statutory deadline. As the *Logan* court explained, all that the "Fourteenth Amendment does require, however, 'is an *opportunity* . . . granted at a meaningful time and in a meaningful manner' for a [process] appropriate to the nature of the case." *Id.* at 437 (emphasis and ellipses in *Logan*; quotation, citation, and brackets omitted) (quoting *Armstrong*, 380 U.S. at 552). Oregon's administrative rule gave voters a meaningful opportunity to place their statements in the Voters' Pamphlet. The rule may have been difficult to follow or find, but those obstacles are different in kind from the total lack of notice in *Armstrong*, or the total lack of opportunity to be heard in *Logan*.

The Supreme Court has noted that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). In another case that year, the Supreme Court stated: "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Relying on these case, a three-judge district court rejected a poll tax imposed by the State of Texas, explaining:

> [W]e hold that the poll tax as a prerequisite to voting in the State of Texas infringes on *the concept of liberty as protected by the Due Process Clause* and constitutes an invalid charge on the exercise of one of our most precious rights—the right to vote.

*United States v. State of Tex.*, 252 F. Supp. 234, 255 (W.D. Tex.) (emphasis added), *aff'd*, 384 U.S. 155 (1966). The facts in the pending case, however, do not equate to a poll tax. No fee is required to vote here, and Oregon has created two paths to have one's views published, both at state expense, in the statewide Voters' Pamphlet. One path involves paying a fee; the other allows for a voter to submit verified signatures. Thus, Plaintiffs have not shown a likelihood of

success on, or even serious questions going to the merits of, their claim based on the Due Process

Clause of the Fourteenth Amendment.[5]

## D.  Americans with Disabilities Act

Plaintiffs also contend that when the Oregon statute is applied under the unique facts

present here, that law violates Title II of the ADA and thus is unenforceable under the

Supremacy Clause. U.S. CONST., art. VI, cl. 2. In relevant part, Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual
> with a disability shall, by reason of such disability, be excluded
> from participation in or be denied the benefits of the services,

---

[5] Plaintiffs also argue that Defendant did not clearly and conspicuously present the relevant deadlines on the State's Elections Division website. The Court notes, however, that if one goes to the home page of the public website of the Oregon Secretary of State, clicks "Voting & Elections," then clicks "Upcoming Elections," then clicks "Voting in Oregon webpage," then clicks "Manuals, Forms, Tutorials and Election Laws," then clicks "Elections Division Rulemaking," one finds a hyperlink to a document titled "Establishes filing process and deadline for Measure 120 arguments and statements." Clicking on that opens a PDF of OAR 165-016-9901, which in relevant part reads:

> (2)(a) To obtain and maintain uniformity in the application and operation of the State Voters' Pamphlet filing, production, and translation process, the Secretary of State establishes March 12, 2026, at 5:00:00 p.m. as the deadline for filing arguments and statements outlined in section 1 of this administrative rule.

> (b) The filing must be accompanied by the required filing fee or a completed voters' pamphlet petition having the required number of signatures in lieu of the filing fee.

> (A) If filing by fee, the filing fee must be paid and received not later than 5:00:00 p.m. on March 12, 2026.

> (B) If filing by petition in lieu of the filing fee, the petition must be filed and the signatures verified by the Secretary of State not later than 5:00:00 p.m. on March 12, 2026. The measure argument filer must ensure the petition is filed with sufficient time for the Secretary of State to verify the signatures prior to the filing deadline. The Secretary of State will verify petition signatures in the order received by filers.

Might this be made easier to find or more conspicuous? Yes. Does it rise to the level of a violation of one's constitutional due process rights? In the opinion of the undersigned, no.

PAGE 13 – OPINION AND ORDER

programs, or activities of a public entity, or be subjected to
discrimination by any such entity.

42 U.S.C. § 12132.

In response, Defendant cites *Weinreich v. Los Angeles County Metropolitan Transportation Authority*, 114 F.3d 976 (9th Cir. 1997). In that case, the Ninth Circuit upheld a challenge under the ADA to a regional public transit system's program for elderly and eligible patrons. The plaintiff qualified for the program after receiving a doctor's certification that he was permanently disabled. A new rule of the program, however, required updated medical certification, which the plaintiff alleged he could not afford. The plaintiff requested an exemption from the recertification requirement based on his indigency, which the defendant denied. The district court concluded that the defendant had no obligation under the ADA to grant the plaintiff an exemption from recertification. *Id.* at 978. The Ninth Circuit affirmed, explaining:

> Weinreich's exclusion from the Reduced Fare Program was not based on the fact or perception that he has a disability. To the contrary, his exclusion was based on the possibility that he does not have a qualifying disability. Specifically, his exclusion was based on his failure to provide updated certification that he has a qualifying disability. Weinreich's inability to provide updated certification was due to his financial circumstances, not to his medical disability. Thus, the MTA's recertification policy did not discriminate against Weinreich on the basis of disability, and the MTA is not required under the ADA or Rehabilitation Act to make reasonable modifications to the Program's eligibility requirements for Weinreich.

*Id.* at 979.

In *Smith v. City of Oakland*, 612 F. Supp. 3d 951 (N.D. Cal. 2020), U.S. District Judge Jon Tigar rejected the City of Oakland's attempt to compare Smith's claims to the facts in *Weinreich*. In *Smith*, the court stated:

PAGE 14 – OPINION AND ORDER

> The City's attempt to compare Plaintiffs' allegations to those in
> *Weinrich* [sic] *v. Los Angeles County Metropolitan Transportation
> Authority*, 114 F.3d 976 (9th Cir. 1997) fails because it improperly
> frames the harm that Plaintiffs allege. In Weinrich, a public transit
> system's policy requiring disabled patrons to recertify their
> disabilities every three years in order to qualify for reduced fare
> discriminated against these patrons not "by reason of" their
> disability but based on their financial circumstances. *Id.* at 979.
> The City argues that, as in *Weinrich*, "Plaintiffs' alleged inability
> to obtain more affordable, accessible housing is a function of
> economics, specifically housing scarcity – not disability." ECF
> No. 20 at 14. However, as discussed above, Plaintiffs do not allege
> "inability to obtain more affordable, accessible housing" but rather
> exclusion from a municipal program that is available to non-
> disabled residents.

*Id.* at 965.

Under ORS 251.255(2)(a), the State offers two alternative pathways to anyone seeking to submit arguments to be published in the statewide Voters' Pamphlet. One pathway requires payment of a fee of $1,200; the other requires timely submission of 500 valid signatures of active electors. The first pathway is open to anyone, regardless of disability. Plaintiffs do not argue that the second pathway as well is open to everyone regardless of disability—provided that the normal, or typical, timeframe is available.

In *Martin*, the undersigned held that because of the confluence of Ms. Martin's indigency and her disability, she was denied the opportunity to have her statement appear in the statewide Voters' Pamphlet. That led the Court to find serious questions going to the merits of her claims. For the Plaintiffs currently before the Court in the pending case, however, we do not have that confluence. Only Ms. Hall appears to present a qualifying disability under the ADA. Thus, the other individual Plaintiffs could gather and present the required petition signatures, as did Ms. Furlong. Regarding Ms. Hall, she does not state that she is indigent. In fact, the only thing she says about her resources is that she does "not have $2,400 to submit the two arguments [she] would have otherwise had time for gathering signatures this summer if Measure 120 hadn't been

moved to the May primary election." She does not state that she does not have $1,200 to submit one written statement and, indeed, says nothing further about her economic situation. Thus, she is not being deprived of the opportunity to have her views printed in the Voters' Pamphlet "because" of her disability and she has not been denied a "reasonable accommodation" of her disability, either of which likely would be violations of the ADA. Thus, Plaintiffs have not shown a likelihood of success on, or even serious questions going to the merits of, their claim based on the ADA.

Because the Court finds neither likelihood of success nor serious questions going to the merits of Plaintiffs' claims, the Court need not address the other factors under *Winter*.

## CONCLUSION

For the reasons stated in this Opinion and Order, the Court DENIES Plaintiff's Motion for Temporary Restraining Order (ECF 2).

**IT IS SO ORDERED**.

DATED this 20th day of March, 2026.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge